**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

RAY LEE ROSS,                    )
                                 )
                Petitioner,      )
                                 )
        v.                       )        1:12CV1301
                                 )
WENDELL HARGRAVE,                )
                                 )
                Respondent.[1]   )


**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Petitioner, a prisoner of the State of North Carolina, seeks
a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket
Entry 6.) A jury in the Superior Court of Rowan County convicted
Petitioner of two counts of attempted first-degree murder, two
counts of assault with a deadly weapon with intent to kill
inflicting serious injury, attempted robbery with a dangerous
weapon, and assault on a female. (Id., ¶¶ 1, 2, 4-6; see also
Docket Entry 11-2 at 58-65 (verdicts).) Based upon the jury's
finding of three aggravating factors (see Docket Entry 11-2 at 66),
the trial court sentenced Petitioner to two consecutive terms of
220 to 273 months' imprisonment (Docket Entry 6, ¶ 3; see also
Docket Entry 11-2 at 69-76 (judgments and findings of aggravating
factors)).

---

[1] Consistent with Rule 2(a) of the Rules Governing Section 2254 Cases, the
Petition in this case originally named Lewis Smith, then-Administrator of
Albemarle Correctional Institution, as Respondent. (Docket Entry 6 at 1.) On
June 27, 2014, the Division of Adult Correction of the North Carolina Department
of Public Safety named Wendell Hargrave as the Administrator of Albemarle
Correctional Institution. See https://www.ncdps.gov (search for Wendell
Hargrave) (last performed Dec. 1, 2014). By operation of Federal Rule of Civil
Procedure 25(d) (applicable to this proceeding pursuant to Rule 12 of the Rules
Governing Section 2254 Cases), Wendell Hargrave thus now appears as Respondent.

The North Carolina Court of Appeals affirmed Petitioner's convictions, but reversed his sentences on the grounds that Petitioner's indictments failed to list the aggravating factors found by the jury and relied upon by the trial court at sentencing. State v. Ross, 216 N.C. App. 337, 350-51, 720 S.E.2d 403, 411-12 (2011). The North Carolina Supreme Court dismissed Petitioner's appeal. State v. Ross, No. 39P12-1, 366 N.C. 400 (table), 735 S.E.2d 174 (Dec. 12, 2012) (unpublished).

Subsequently, Petitioner filed a pro se motion for appropriate relief ("MAR") with the state trial court (Docket Entry 12-4), which that court denied on the merits (Docket Entry 6 at 59-61). The North Carolina Court of Appeals then denied Petitioner's certiorari petition and request for a belated appeal. (Docket Entry 12-5 (petition); Docket Entry 6 at 24 (order)).

In the interim, the trial court resentenced Petitioner to two consecutive sentences of 220 to 273 months' imprisonment. (Docket Entry 13-3 at 2-3.) At that resentencing, the state did not seek sentences in an aggravated range, but did add the fact of Petitioner's conviction for driving while impaired to his prior conviction worksheet, which raised his prior record level from II to III (resulting in a presumptive sentencing range equal to the original aggravated range). (Id. at 4-5.)

Petitioner then instituted this action. (Docket Entry 6.) Respondent answered (Docket Entry 9), and moved for summary judgment (Docket Entry 10). Petitioner responded in opposition to Respondent's summary judgment motion. (Docket Entries 16, 17, 18.)

For the reasons that follow, the Court should deny any habeas relief.

## II.  PETITIONER'S CLAIMS

The Petition identifies three grounds for relief.  (Docket Entry 6, ¶ 12.)  Petitioner alleges that (1) the trial court violated the Confrontation Clause of the Sixth Amendment to the United States Constitution by admitting as evidence (a) an audio-visual recording of a victim's testimony taken at a pretrial probable cause hearing, and (b) the "testimony and handwritten notes of law enforcement officers utilized . . . to corroborate . . . unsigned statement[s] attributed to [the victim]" (id. at 5-9); (2) the trial court violated Petitioner's right to due process by granting the state's motion for joinder of the offenses for trial (id. at 10-13); and (3) the trial court violated Petitioner's right to due process by resentencing him, following appellate remand, using a prior record level increased by an "obscure" impaired driving offense from 1981 (Id. at 14-16).

## I. FACTS

The facts of the case, as set out in the North Carolina Court of Appeals' opinion in Petitioner's direct appeal, appear as follows:

> At approximately 5:30 or 6:00 a.m. on 2 February 2007, Pedro Romero Amaro and his wife, Angelica Martinez Besies, were asleep in their mobile home when a knock at their door woke them up.  Mr. Amaro got out of bed and went to the front door.  When he opened it, he saw [Petitioner] carrying something in a black plastic bag. Mr. Amaro knew [Petitioner] as a friend of a friend, and [Petitioner] had come to Mr. Amaro's residence a day or two earlier and sold Mr. Amaro a Mossberg shotgun.

Mr. Amaro let [Petitioner] inside, as he believed [Petitioner] was there to sell him another firearm. Mr. Amaro walked towards the kitchen and started to make coffee when he heard a gunshot. Mr. Amaro then felt heat at the back of his head and his vision began to get blurry. The next thing that he heard was his wife screaming in the bedroom and another gunshot.

During the same time frame, Ms. Besies, while she was in the bedroom, heard a noise from the kitchen and then heard her husband scream. [Petitioner] came into the bedroom and pointed his gun at Ms. Besies' head as she lay in bed. The gun was covered with a black plastic bag and had tape around it. Ms. Besies reached for the gun and moved it away from her head just as [Petitioner] pulled the trigger. She was shot in the hand and screamed. [Petitioner] then punched her in the face, breaking her nose, and grabbed her by the arm, trying to pull her out of bed.

Mr. Amaro came into the bedroom and saw his wife and [Petitioner] struggling. Mr. Amaro began to strike [Petitioner] in the face with his fists, and Ms. Besies was able to wrest the rifle from [Petitioner]. Mr. Amaro subdued [Petitioner] by holding him down on the bathroom floor while Ms. Besies called 911 and took [Petitioner]'s firearm outside where she waited for the law enforcement officers.

Four officers with the Kannapolis Police Department arrived at the mobile home at approximately 6:15 a.m. The officers found Ms. Besies standing on the porch of the mobile home with her hand bleeding, and she told them that she had been shot. The officers also saw that a long gun inside a garbage bag was lying against the tongue of the trailer. Ms. Besies told the officers that her husband was holding a man down inside the home.

Three of the officers went inside and found Mr. Amaro holding [Petitioner] down on the bathroom floor. The floor was covered in blood. The officers saw that [Petitioner] had injuries to his head and face, and once he and Mr. Amaro were separated, [Petitioner] was secured by the officers and led into the living room. The officers saw that Mr. Amaro had blood on the back and side of his head, and he told them that [Petitioner] had shot him in the back of the head.

While the officers waited with [Petitioner] for medical personnel to arrive, [Petitioner] told the officers that he had come to the residence to collect money that Mr.

Amaro owed him from a drug deal and that he had brought the gun in order to frighten Mr. Amaro into giving him the money.  He said that Mr. Amaro attacked him, and in the struggle, [Petitioner]'s gun accidentally discharged, shooting Mr. Amaro.  Then, [Petitioner] went into the bedroom to get the money from Ms. Besies, but, according to [Petitioner], she grabbed the gun, and it again accidentally discharged.  At that point, Mr. Amaro came into the bedroom and began to fight with [Petitioner].

Mr. Amaro and Ms. Besies were transported to the emergency room to have their injuries treated. Diagnostic imaging revealed that Mr. Amaro did in fact have a bullet lodged in his brain, and Mr. Amaro was kept at the hospital for several days for observation.  Ms. Besies had been shot through the thumb, and there was gun powder stippling present on her skin that indicated she had been shot at a close range.  Lead fragments from the bullet were still present in Ms. Besies' flesh when the doctor treated her injuries.  Surgery was required to repair a broken bone in Ms. Besies' thumb.

In the days following the shooting, Mr. Amaro and Ms. Besies were both interviewed repeatedly by law enforcement officers.  Upon being released from the hospital, both Mr. Amaro and Ms. Besies were arrested on numerous drug-related charges.

Law enforcement officers collected numerous items of evidence from Mr. Amaro and Ms. Besies' residence, including [Petitioner]'s rifle, which was a Ruger .22 caliber semi-automatic rifle with a homemade silencer attached.  The officers also seized a duffle bag carried by [Petitioner] to the house that contained an electric drill, a utility knife, a pillow case, a curtain tieback, and a sock tied into a knot.  The officers also located the Mossberg 12 gauge shotgun [Petitioner] had sold to Mr. Amaro.  Marijuana, electric scales, and various amounts of both real and counterfeit United States currency were also found in the residence.  Further investigation uncovered that Ms. Besies had moved a cache of drugs from the residence to another location just prior to the arrival of the police.  In his testimony at trial, Mr. Amaro admitted that he sold drugs from his home.

Officers interviewed [Petitioner] on the afternoon of the shooting. [Petitioner] again claimed that Mr. Amaro owed him money from a drug deal and that he had gone to the house that morning to collect his money.  [Petitioner] stated that he took his .22 caliber Ruger rifle in order

to frighten Mr. Amaro into giving him money, and he attached a homemade silencer (constructed from a plastic drink bottle, cotton balls, and duct tape) because he "did not want to make too much noise because if [he] shot the gun in the trailer park the neighbors would hear it and call the police." [Petitioner] claimed that he had taken the duffle bag with him in order to trick Mr. Amaro into believing that he had another gun to sell.

When he arrived at the trailer park, [Petitioner] parked his car in front of a different trailer. Once Mr. Amaro let [Petitioner] inside his home, [Petitioner] claimed that they argued over the money and that the rifle discharged during the ensuing struggle. [Petitioner] believed that Mr. Amaro was unconscious, so he went into the bedroom and demanded money from Ms. Besies while pointing the gun at her legs. [Petitioner] claimed that Ms. Besies grabbed the gun, and that the gun accidentally discharged again during the struggle. Mr. Amaro then came down the hallway, and he and [Petitioner] began to fight. [Petitioner] claimed Mr. Amaro attempted to drown him in the bathtub while telling his wife to shoot [Petitioner]. Ultimately, Mr. Amaro had subdued [Petitioner] by the time law enforcement officers arrived.

That same afternoon, law enforcement officers went to [Petitioner]'s home, and [Petitioner]'s wife gave them permission to search the house. In the garage, the officers found a plastic drink bottle that had been cut in half lying near a roll of duct tape. These items were consistent with the homemade silencer on the rifle [Petitioner] used to shoot Mr. Amaro and Ms. Besies.

While in custody, Ms. Besies testified at a probable cause hearing in this case on 21 February 2007. In April or May 2007, however, she posted bond and was released from jail. Ms. Besies was last seen by her lawyer in October 2007. Her attorney had no knowledge of her location at the time of trial. Mr. Amaro was still in custody at the time of the trial in this case and testified that in May 2008 he had received a letter from Ms. Besies informing him that she was in Cancun, Mexico.

The Mossberg shotgun that [Petitioner] sold to Mr. Amaro on or about 1 February 2007 was evidence in another shooting that occurred just a few days earlier. On Monday, 29 January 2007, Heather Helms discovered the body of her father, Henry Aldridge, on the floor of the living room of his home. He had been shot twice in the back of the head with a .22 caliber weapon. Evidence suggested that the shooting took place early in the

morning.  Ms. Helms had last seen her father alive on Saturday, two days earlier.

Among the items missing from Mr. Aldridge's home when his body was discovered was a large amount of cash as well as a Mossberg shotgun that Ms. Helms had purchased for her father in November 2006.  Mr. Aldridge's neighbor testified that he had last seen the Mossberg shotgun inside Mr. Aldridge's house either the Tuesday or Wednesday before his murder when he had borrowed the shotgun to scare off an animal.  On Saturday, 27 January 2007, Mr. Aldridge telephoned the neighbor in the morning to complain that the neighbor had neglected to clear the shell casing from the shotgun after having fired it.

On 1 February 2007, [Petitioner] sold the Mossberg shotgun to Mr. Amaro.  When interviewed by law enforcement, [Petitioner] admitted that he had known Mr. Aldridge and that he had previously been to his house.

Ross, 216 N.C. App. at 339-42.

## III.  HABEAS STANDARDS

The Court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Further, "[b]efore [the] [C]ourt may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court.  In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to [this] [C]ourt in a habeas petition.  The exhaustion doctrine . . . is now codified at 28 U.S.C. § 2254(b)(1)."  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see also 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement.").

When a petitioner has exhausted state remedies, this Court must apply a highly deferential standard of review in connection with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d). More specifically, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. To qualify as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result opposite" to the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000). A state court decision "involves an unreasonable application" of United States Supreme Court case law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see also id. at 409–11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous").

## IV.  DISCUSSION

### A. Ground One - Confrontation Clause Violation

In his first ground for relief, Petitioner asserts that the trial court violated his Sixth Amendment right under the Confrontation Clause by admitting (1) an audio-visual recording of testimony of one of the victims, Ms. Besies, taken at a pretrial probable cause hearing, and (2) the testimony and/or handwritten notes of three law enforcement officers regarding interview statements attributed to Ms. Besies.  (Docket Entry 6 at 5-10; Docket Entry 18 at 2-8.)  According to Petitioner, the trial court improperly admitted Ms. Besies' pretrial testimony because, at the time of her testimony, Petitioner had not received all of the discovery in the case, he had not had sufficient time to review the discovery he had received, the trial court had not yet joined for trial the various charges against Petitioner, and his lead counsel had not yet entered an appearance in the case.  (Docket Entry 6 at 6.)  With regard to Ms. Besies' statements to law enforcement officers, Petitioner contends the trial court improperly admitted that evidence for two reasons.  First, Petitioner maintains that a statement given by another victim, Mr. Amaro, contradicted Ms. Besies' statements regarding the timing of Mr. Amaro's purchase of the murder weapon from Petitioner, and that her statements "went beyond the contents" of her testimony at the probable cause hearing and, therefore, her statements to the officers did not qualify as corroborative evidence.  (Docket Entry 6 at 7-9; Docket Entry 18 at 3.)  Second, because, at the time of the pretrial probable cause

hearing, the state had not yet disclosed the officers' notes regarding their interviews with Ms. Besies, Petitioner "never had a[n] opportunity to cross[-]examine [Ms. Besies] as to whether or not she had actually [given] the statements to the officers," in violation of <u>Crawford v. Washington</u>, 541 U.S. 36 (2004). (Docket Entry 18 at 6.) These arguments fall short.

Petitioner raised the substance of this claim on direct appeal (<u>see</u> Docket Entry 11-3 at 14-21), and the North Carolina Court of Appeals denied the claim as follows:

> [Petitioner] next contends that the trial court violated the Confrontation Clause when it admitted into evidence (1) Ms. Besies' testimony given at [Petitioner]'s probable cause hearing, and (2) statements given by Ms. Besies to law enforcement officers. We disagree.
>
> A. Probable Cause Testimony
>
> "The Confrontation Clause of the Sixth Amendment bars admission of testimonial evidence unless the declarant is unavailable to testify and the accused has had a prior opportunity to cross-examine the declarant." <u>State v. Locklear</u>, 363 N.C. 438, 452, 681 S.E.2d 293, 304 (2009) (citing <u>Crawford v. Washington</u>, 541 U.S. 36, 68 (2004), and <u>State v. Lewis</u>, 361 N.C. 541, 545, 648 S.E.2d 824, 827 (2007)).
>
> [Petitioner] concedes that Ms. Besies was "an unavailable witness at trial." With respect to the prior opportunity to cross-examine, [Petitioner] not only had an opportunity to cross-examine Ms. Besies at the probable cause hearing, but his counsel did in fact cross-examine her. Nonetheless, he contends that the admission of this testimony was error under <u>Crawford</u>.
>
> No North Carolina appellate court has directly addressed the question whether an opportunity to cross-examine a witness at a probable cause hearing is sufficient to meet the requirements of <u>Crawford</u>. However, our Supreme Court explained in <u>State v. Lewis</u>, 360 N.C. 1, 16, 619 S.E.2d 830, 840 (2005) (emphasis added), <u>judgment vacated on other grounds</u>, 548 U.S. 924 (2006), that "several types of preliminary hearings may afford an opportunity for

witness testimony, <u>such as the probable cause hearing</u> provided for in N.C.G.S. § 15A-606 and 15A-611, . . . . Statements by witnesses at all of these hearings are likely to be testimonial under <u>Crawford</u> and, if so, are inadmissible at trial unless the defendant had an opportunity to cross-examine the witness and the witness is unavailable at the time of the trial."

This language suggests that the opportunity to cross-examine a witness at a probable cause hearing will render the probable cause testimony admissible if the witness subsequently becomes unavailable. <u>See also</u> <u>State v. Estrella</u>, 277 Conn. 458, 475, 476-77, 893 A.2d 348, 359, 360 (2006) (holding that "the defendant had a more than adequate and full opportunity to cross-examine [witness] both generally and specifically to address whether [witness] was giving truthful testimony," and therefore "the trial court properly admitted into evidence at the trial [witness'] transcribed testimony at the probable cause hearing"); <u>cf.</u> <u>United States v. Doyle</u>, 621 F. Supp. 2d 337, 344 (W.D. Va. 2009) (holding prior testimony of unavailable witness at bond hearing was properly admitted and did not violate Confrontation Clause because facts showed defendant had opportunity and similar motive to question witness at hearing and subsequent trial).

[Petitioner] contends, however, that he had no meaningful opportunity to cross-examine Ms. Besies at the probable cause hearing because the various charges had not yet been joined, [Petitioner]'s lead trial counsel had not yet been appointed, and his counsel at that time had not yet had an opportunity to review all the discovery.  The probable cause hearing took place with respect to the charges  involving Ms. Besies and Mr. Amaro, the sole charges on which the jury found [Petitioner] guilty. Thus, with respect to the charges on appeal, [Petitioner]'s motive to cross-examine Ms. Besies would have been the same as his motive at trial.  [Petitioner] does not identify any topics that his counsel did not address at the probable cause hearing that would have been covered in cross-examination at the trial.  <u>See</u> <u>State v. Ramirez</u>, 156 N.C. App. 249, 258, 576 S.E.2d 714, 721 (2003) ("The testimony was taken at a preliminary stage of this case [at a bond hearing], and [Petitioner] had the same motive at that time as he would have had at trial, to expand upon and possibly discredit [witness'] testimony.").

At the probable cause hearing, [Petitioner] was represented by counsel who was appointed for the

Amaro/Besies charges and who was co-counsel at trial. The Confrontation Clause requires that [Petitioner] have a meaningful opportunity to cross-examine the witness -- [Petitioner] has cited no authority suggesting that he lacked a meaningful opportunity to cross-examine when only one of his two trial attorneys was at the prior hearing.

Further, our courts have never held that discovery must be complete for a cross-examination opportunity to be adequate. Here, [Petitioner] was represented by counsel at the probable cause hearing (who was one of his trial counsel), he had the same motive to cross-examine Ms. Besies as at trial, and his counsel did in fact cross-examine Ms. Besies. These circumstances are sufficient to establish an adequate opportunity to cross-examine Ms. Besies. The trial court, therefore, did not err in admitting Ms. Besies' probable cause hearing testimony. See State v. Clark, 165 N.C. App. 279, 287, 598 S.E.2d 213, 219 (2004) ("At the earlier trial, defendant was present, represented by counsel, had an opportunity to cross-examine [witness], and, through his counsel, did cross-examine her.").

B. Statements to Law Enforcement Officers

In addition to the probable cause testimony, the trial court allowed three law enforcement officers to read to the jury statements that Ms. Besies had given to them. With respect to the first two officers, when the State sought to admit evidence of the statements, [Petitioner] objected, and the trial court admitted the statements solely for purposes of corroboration. As for the third law enforcement officer, defense counsel asserted at trial that if the statement was admitted only for corroborative purposes, he had no objection. Since the trial court limited the third statement's use to corroboration, as requested by [Petitioner], and since [Petitioner] does not argue plain error on appeal, [Petitioner] has not preserved for appellate review any issue as to the admission of the third statement.

With respect to the first two statements, our Court has previously noted that when "evidence is admitted for a purpose other than the truth of the matter asserted," such as when evidence is admitted solely for purposes of corroboration, then "the protection afforded by the Confrontation Clause against testimonial statements is not at issue." State v. Walker, 170 N.C. App. 632, 635, 613 S.E.2d 330, 333 (2005). [Petitioner] argues that the written statements were nonetheless inadmissible because

they "went far beyond the testimony the witness presented in the probable cause hearing." According to our Supreme Court, North Carolina case law establishes "the rule that prior consistent statements are admissible even though they contain new or additional information so long as the narration of events is substantially similar to the witness' in-court testimony." State v. Williamson, 333 N.C. 128, 136, 423 S.E.2d 766, 770 (1992). See also State v. Ramey, 318 N.C. 457, 470, 349 S.E.2d 566, 574 (1986) ("The victim's prior oral and written statements to [the detective], although including additional facts not referred to in his testimony, tended to strengthen and add credibility to his trial testimony. They were, therefore, admissible as corroborative evidence.").

Here, while [Petitioner] contends that the testimony contained "'significant additional facts,'" he does not specifically identify which facts precluded the statements from being admitted as corroborative evidence. Our review indicates that the statements to the officers added some details to the description in Ms. Besies' probable-cause testimony of the morning of the shooting and her earlier encounter with [Petitioner] when he sold a gun to Mr. Amaro. The information contained in these statements regarding the material events was, however, "substantially similar" and not contradictory to that given by Ms. Besies during the probable cause hearing.

The statements also added information regarding Mr. Amaro's and Ms. Besies' drug dealing, counterfeiting activity, and illegal immigration. We fail to see how the jury's hearing information regarding the criminal activity of Mr. Amaro and Ms. Besies prejudiced [Petitioner]. We, therefore, hold that the trial court did not abuse its discretion in admitting the additional statements made by Ms. Besies to law enforcement as corroborative evidence.

Ross, 216 N.C. App. at 344-47, 720 S.E.2d at 408-10 (parallel citations omitted). Petitioner arguably raised this same claim in his petition for discretionary review (see Docket Entry 12-2 at 3-4), and the North Carolina Supreme Court subsequently declined review, Ross, 366 N.C. 400 (table), 735 S.E.2d 174.

As a result of this state court adjudication on the merits, Section 2254(d)(1)'s deferential review standard applies to Ground

One.  To secure relief under that standard, Petitioner must show that, in denying this claim, the North Carolina Court of Appeals reached "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law," Williams, 529 U.S. at 405, "confront[ed] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[d] at a result opposite to that reached by [the United States Supreme Court]," id., or "identifie[d] the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applie[d] it to the facts of [his] case," id. at 407.  Petitioner cannot make that showing.

In Crawford, the United States Supreme Court held that "[w]here testimonial evidence is at issue . . . , the Sixth Amendment demands what the common law required:  unavailability and a prior opportunity for cross-examination. . . . Whatever else the term ["testimonial"] covers, it applies at a minimum to prior testimony at a preliminary hearing [or] before a grand jury . . . ."  Crawford, 541 U.S. at 68.  Here, as recognized by the North Carolina Court of Appeals in deciding Petitioner's direct appeal, see Ross, 216 N.C. App. at 344, 720 S.E.2d at 408, Petitioner does not dispute either Ms. Besies's unavailability as a witness at trial or that one of his defense lawyers cross-examined Ms. Besies at the probable cause hearing (see Docket Entry 6 at 5-6; Docket Entry 18 at 2, 7; see also Docket Entry 11-2 at 48-51 (Petitioner's cross-examination of Ms. Besies at probable cause hearing)).

Petitioner emphasizes that he did not have a full and fair opportunity to cross-examine Ms. Besies, because he lacked certain discovery and an opportunity to review existing discovery in the case, the trial court had yet to join his criminal offenses for trial, and lead counsel had not yet made an appearance in his case. (Docket Entry 6 at 6.)  However, no United States Supreme Court case requires that the prior opportunity for cross-examination occur only after joinder of all charges or the receipt of all discovery, or that a criminal defendant's entire legal team must have an opportunity to engage in the cross-examination.  Rather, Supreme Court cases require a "complete and adequate opportunity to cross-examine," Pointer v. Texas,380 U.S. 400, 407 (1965), and prohibit "significant[] limit[ation] . . . in the scope or nature of [the] cross-examination," California v. Green, 399 U.S. 149, 166 (1970).  See Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (holding that "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish"); see also Al-Timimi v. Jackson, 379 F. App'x 435, 437-38, (6th Cir. 2010) (holding that, even where defense counsel at probable cause hearing might have "lack[ed] adequate motivation to conduct a thorough cross-examination" and possibly "wish[ed] to avoid tipping [their] hand to the prosecution by revealing the lines of questioning [they] plan[ned] to pursue," and where defense counsel did not know of the interview police conducted with the witness and had not yet received the interview notes from the

prosecution, under "high threshold established by AEDPA [and] [r]eviewing the Supreme Court's cases in this area, we cannot find that the trial court's decision to admit the [witness's probable cause] testimony was contrary to, or involved an unreasonable application of clearly established federal law"); United States ex rel. Haywood v. Wolff, 658 F.2d 455, 462 (7th Cir. 1981) (recognizing that the Supreme Court "has never said that either the opportunity to cross-examine, or the actual cross-examination conducted at the preliminary hearing, must be as full and complete as allowed at trial in order for testimony from such a proceeding to be admissible in the event the witness subsequently becomes unavailable"). Petitioner has not shown significant limitation in the scope or nature of his opportunity to cross-examine Ms. Besies at the probable cause hearing.[2] Thus, the North Carolina Court of Appeals did not contradict or unreasonably apply Crawford in denying Petitioner's parallel claim on direct appeal.

The Court should reach the same conclusion with respect to Petitioner's arguments regarding Ms. Besies' interview statements to law enforcement officers. Petitioner maintains that the trial court should not have admitted Ms. Besies' statements as

---

[2] To the extent Petitioner claims significant limitation in his cross of Ms. Besies from the fact that, at the time of the probable cause hearing, the trial court had not yet joined the charges arising out of the murder of Henry Aldridge to Petitioner's other charges, such a claim fails. The jury found Petitioner not guilty of the Aldridge charges and Petitioner's motives to cross-examine Ms. Besies at the probable cause hearing and at trial remained the same concerning the charges at issue on appeal (and in this Court). See Trigones v. Bissonnette, 296 F.3d 1, 12 (1st Cir. 2002) (noting that "it is clear that in many cases the motive at a preliminary hearing is sufficiently similar to the motive at trial to bring the evidence within the Confrontation Clause's requirements . . .").

corroborative evidence because those statements contradicted Mr. Amaro's statement and "went beyond the contents" of Ms. Besies' testimony at the probable cause hearing. (Docket Entry 6 at 7-9; Docket Entry 18 at 3.) However, as the trial court did not admit that evidence for the truth of the matter asserted (see Docket Entry 14-4 at 84-85, 96-99; 14-5 at 35-37), Confrontation Clause and hearsay concerns do not arise. Indeed, as the North Carolina Court of Appeals recognized, resolution of this issue involves interpretation of state evidentiary law and does not implicate Crawford or the federal Constitution. Ross, 216 N.C. App. at 346-47, 720 S.E.2d at 409 (reaffirming that "when evidence is admitted for a purpose other than the truth of the matter asserted, such as when evidence is admitted solely for purposes of corroboration, then the protection afforded by the Confrontation Clause against testimonial statements is not at issue" (internal quotation marks and emphasis omitted)); see also Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Petitioner's contention that his lack of "a[n] opportunity to cross[-]examine [Ms. Besies] as to whether or not she had actually [given] the statements to the officers" violates Crawford (see Docket Entry 18 at 6), fails for the same reason.

In sum, Petitioner cannot secure habeas relief via Ground One.

## B.  Ground Two - Improper Joinder

In his second ground for relief, Petitioner argues that the trial court violated due process by granting the state's motion for joinder of the charges against Petitioner arising out of the assaults on Ms. Besies and Mr. Amaro and the charges arising out of the murder of Henry Aldridge.  (Docket Entry 6 at 10.)[3]  Petitioner claims that Ms. Besies' testimony at the probable cause hearing constituted the "transactional connection" on which the state based its motion for joinder of the charges.  (Id. at 11-12; see also Docket Entry 18 at 8-9.)  However, Petitioner emphasizes that Mr.

_____

[3] Respondent alleges that Petitioner's second ground for relief "is procedurally defaulted, in that he did not raise it in state court . . . ." (Docket Entry 11 at 9.)  Although Respondent notes that Petitioner "raised a similar issue on direct appeal to the North Carolina Court of Appeals," Respondent maintains that Petitioner did not fairly present "both the operative facts and the controlling legal principles" of his federal due process claim to the Court of Appeals.  (Id. at 10-11 (citing Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997).)  In the Court of Appeals, Petitioner contended that the trial court erred by denying his motion to sever the offenses, or alternatively, his motion to reconsider the original grant of the state's motion for joinder (Docket Entry 11-3 at 37-40), whereas in the instant Petition, he attacks the trial court's original grant of the motion for joinder (Docket Entry 6 at 10-13; see also Docket Entry 18 at 8-11).  Due to the focus of Petitioner's appellate argument on the motions to sever and to reconsider, the Court of Appeals disposed of the issue by holding that "one Superior Court judge may not . . . modify, overrule, or change the judgment of another Superior Court judge previously made in the same action" and did not discuss federal due process principles.  Ross, 216 N.C. App. at 343, 720 S.E.2d at 407.  Although Petitioner's appellate argument did include a contention that the trial court denied his right to a fair trial "under the [Sixth] and [Fourteenth] Amendments to the United States Constitution," (Docket Entry 11-3 at 37), Petitioner's argument does not explain his inclusion of the Sixth Amendment (ensuring speedy trials, the right to counsel, and the right to confront witnesses) and omission of the Fifth Amendment (federal due process) (Id. at 37-40).  On the other hand, Petitioner's appellate argument and instant ground for relief both challenge the transactional connection between the joined offenses and claim prejudice from juror exposure to the Aldridge murder evidence.  (Compare Docket Entry 11-3 at 37-41 with Docket Entry 6 at 10-13.)  The Court need not resolve this issue of procedural default, as Petitioner's instant claim lacks merit.  Cummings v. Sirmons, 506 F.3d 1211, 1239 n.4 (10th Cir. 2007) (declining to decide whether claim in state appellate court that trial court's denial of motion to sever violated the Eighth and Fourteenth Amendments, but not the Fifth Amendment, fairly presented the claim to appellate court, where claim lacked merit).

Amaro's statement to law enforcement officers contradicted Ms. Besies' testimony (Docket Entry 6 at 12; Docket Entry 18 at 9), and that this factual conflict should have caused the trial court to deny the motion for joinder. (Docket Entry 6 at 12-13.) In addition, Petitioner asserts that, although the jury acquitted him of the Aldridge charges, "the joinder of all of the offenses caused Petitioner to not receive a fair trial because of the improper influences and other materials exposed to the . . . jurors from the murder offense." (Id.; see also Docket Entry 18 at 10-11 (asserting that, because the "jurors w[ere] unnecessarily exposed to the graphic autopsy photographs and other photos from the [Aldridge] crime scene," they "could have easily been influenced to believe that Petitioner just had to be guilty of something").) These arguments fall short.

Petitioner's argument that factual conflicts in the "transactional connection" evidence rendered joinder of the charges improper constitutes a matter of state law[4] not cognizable on federal habeas review. See U.S. v. Lane, 474 U.S. 438, 446 & n.8 (1996) (holding that "[i]mproper joinder does not, in itself, violate the Constitution" and that misjoinder rises "to the level of a constitutional violation only if it results in prejudice so

---

[4] Under North Carolina law, a trial court may join offenses for trial "when the offenses are based on the same act or transaction, or a series of acts or transactions connected together or constituting parts of a single scheme or plan." State v. Manning, 139 N.C. App. 454, 458, 534 S.E.2d 219, 223 (2000); see also N.C. Gen. Stat. § 15A-926(a). "It is within the trial judge's discretion whether to permit the consolidation of offenses against a defendant" and the state appellate courts "will not overturn that decision absent a clear showing of abuse of discretion." State v. Cromartie, 177 N.C. App. 73, 78, 627 S.E.2d 277, 281 (2006).

great as to deny a defendant his Fifth Amendment right to a fair trial"); Estelle, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); see also Coley v. Bagley, 706 F.3d 741, 753-54 (6th Cir. 2013) (finding misjoinder claim did not raise a constitutional violation where the petitioner could not show prejudice); Cummings v. Sirmons, 506 F.3d 1211, 1239 (10th Cir. 2007) (same).

Petitioner attempts to demonstrate prejudice arising from the joinder by arguing that exposure to "graphic autopsy photographs" and other evidence from the Aldridge murder "could have . . . influenced" the jury "to believe that Petitioner just had to be guilty of something . . . ." (Docket Entry 18 at 11; see also Docket Entry 6 at 13.) Such speculative and unsupported allegations do not suffice to establish prejudice. Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992) ("Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing."), abrogated on other grounds, Gray v. Netherland, 518 U.S. 152, 165-66 (1996). Petitioner makes no argument that the trial court's instructions to the jury improperly conflated the Besies/Amaro charges with the Aldridge charges. (See Docket Entry 6 at 10-13; see also Docket Entry 18 at 8-11.) Moreover, the jury acquitted Petitioner of the Aldridge charges, which shows that the jurors could properly compartmentalize the evidence relating to the various offenses. See Blaney v. Ballard, No. 6:13-cv-08538, 2014 WL 1276502, at *9 (S.D.W. Va. March 27, 2014) (unpublished)

(denying misjoinder claim due to lack of prejudice and noting that jury "carefully considered each charge and acquitted [the petitioner] of five counts of the indictment").

In conclusion, Ground Two fails on its merits.

## C.  Ground Three - Resentencing Error

In his third and final ground for relief, Petitioner contends that the trial court violated his right to due process by resentencing him, following appellate remand, based on a prior record level that included an "obscure" impaired driving offense from 1981.  (Docket Entry 6 at 14-16; see also Docket Entry 18 at 14-15.)[5]  Petitioner appears to deny the validity of the 1981 conviction.  (Docket Entry 6 at 15; Docket Entry 18 at 15.) According to Petitioner, even if the conviction existed, to count towards his prior record level, the conviction "must qualify as a criminal offense or Class[] A1 or 1 misdemeanor under Chapter 20 of [North Carolina's] motor vehicle law . . . which only date[s] back

_____

[5] In Petitioner's response in opposition to Respondent's instant summary judgment motion, he adds the ground that the state's inclusion of that "obscure" 1981 impaired driving conviction to calculate his prior record level violates the "ex post facto clause[] of the United States Constitution," because in 1981, impaired driving constituted a "traffic violation" and not a criminal offense. (Docket Entry 18 at 15.)  Thus, he argues that "[t]he State has been allowed to make criminal an act that was not criminal when allege[d]ly committed."  (Id.) However, a summary judgment response (or traverse) "is not the proper place to raise new facts.  Under Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner must set forth in his petition 'the facts supporting each ground' for relief."  Velasquez v. Gipson, No. SA CV 12-1078(JSL), 2013 WL 3381371, at *9 n.4 (C.D. Cal. July 8, 2013) (unpublished) (emphasis added); see also Quackenbush v. Tilton, No. 07CV413W(WMC), 2008 WL 183710, at *6 (S.D. Cal. Jan. 18, 2008) (unpublished) ("Facts must be stated, *in the petition*, with sufficient detail to enable the Court to determine, from the face of the petition, whether further habeas corpus review is warranted.  Moreover, the allegations should be sufficiently specific to permit the respondent to assert appropriate objections and defenses." (internal citations omitted) (emphasis in original)).

to 1983." (Id. at 15-16; see also Docket Entry 18 at 15.) This claim fails as procedurally barred.

Petitioner faces a procedural bar of Ground Three, because he did not challenge his resentencing by filing a direct appeal and did not raise the substance of Ground Three in his MAR (which he dated January 13, 2013, the same day the trial court resentenced him). (See Docket Entry 12-4.)[6] Further, if Petitioner now returned to state court and attempted to raise Ground Three in a MAR, the trial court would find such a claim procedurally barred by North Carolina's mandatory procedural bar statute, N.C. Gen. Stat. § 15A-1419(a)(1). See Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998) (holding that procedural default occurs when habeas petitioner fails to exhaust available state remedies and court to which the petitioner must present his claim in order to satisfy exhaustion requirement would now find claim procedurally barred). Petitioner has not argued that cause and prejudice or a fundamental miscarriage of justice exist to excuse his default (see Docket Entries 6, 18), and no such grounds appear from the record. Accordingly, Ground Three fails as procedurally barred.

---

[6] Petitioner's inclusion of the substance of Ground Three in his certiorari petition in the North Carolina Court of Appeals in which he sought a belated appeal does not suffice to exhaust his state court remedies. Castille v. Peoples, 489 U.S. 346, 351 (1989) (finding claim raised for first time in discretionary petition to state appellate court insufficient to exhaust state remedies); Felton v. Barnett, 912 F.2d 92, 95 (4th Cir. 1990) (recognizing that under North Carolina procedure, certiorari petition constitutes a discretionary petition, denial of which does not constitute an adjudication of merits but discretionary refusal to hear case).

## V.  CONCLUSION

Petitioner's habeas claims fail as a matter of law.

**IT IS THEREFORE RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 10) be granted, that the Petition (Docket Entry 6) be denied, and that Judgment be entered dismissing this action without issuance of a certificate of appealability.

                              /s/ L. Patrick Auld
                            **L. Patrick Auld**
                  **United States Magistrate Judge**

December 22, 2014